UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:15-CV-175-TBR


JESSICA DAQUILLA,                                                                PLAINTIFF

v.

MEGAN J. BRENNAN
POSTMASTER GENERAL,                                                        DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment. [DN 38.] Plaintiff Jessica Daquilla has responded, [DN 45], and Defendant, the United States of America, on behalf of its Agency the United States Postal Service, has replied. [DN 49.] This matter is fully briefed and ripe for adjudication. For the following reasons, Defendant's Motion [DN 38] is **GRANTED IN PART AND DENIED IN PART.**

## I. BACKGROUND

Jessica Daquilla ("Daquilla") filed the current action against Megan J. Brennan, the Postmaster General of the United States Postal Service, ("USPS"), under Title VII of the Civil Rights Act of 1964, alleging age and gender discrimination, age- and gender-based hostile work environment, and retaliation. [*See* DN 27.] Daquilla, a female over the age of 50, is an employee of the USPS, and has worked there since 2007. [*Id.* at 3.] She has worked at numerous locations, but transferred to the Murray, Kentucky Post Office in 2013, where she became a city route carrier. [*Id.* at 4.] In October of 2014, she began working "Route 6" for the Murray Post Office, where her supervisor was Amanda Wallace. [*Id.*] That same month, Sean Clark ("Clark") was hired as the new Postmaster for the Murray Post Office. [*Id.*]

1

Daquilla alleges in her Amended Complaint that, as soon as Clark started his job as Postmaster there, she noticed that he "treated female employees, especially older female employees, differently than the male employees. To the female employees, he was condescending, belittling, hateful, and demeaning. To the male employees he treated them with professional courtesy." [*Id.*] Daquilla further alleges that, soon after Clark started, he began staring at her while she was working in the office, and made belittling and humiliating comments toward her. [*Id.*] Clark also allegedly treated her in a "hostile manner." [*Id.*]

In her Amended Complaint, Daquilla refers to a few specific incidents, which contributed to the filing of this lawsuit: first, she alleges that "Clark ordered [her] to meet the route timing that had been established by a much younger and taller male carrier who had the route previous[ly]." [*Id.* at 5.] Next, in October of 2014, Clark denied Daquilla relief on her route and then walked the route with her, at which time he allegedly made an inappropriate comment to her. [*Id.*] Daquilla claims that Clark complained that his legs hurt from walking at such a slow pace, and "that a monkey could do the job of Plaintiff." [*Id.*] Clark disputes this narrative, claiming that Daquilla asked him why he stopped being a mail carrier, to which he replied that the repetitiveness of the job made him feel like a monkey. Next, Daquilla alleges that Clark rearranged her delivery route in such a way that she had to walk further, and was able to use her mail truck less. [*Id.* at 5-6.] In November of 2014, a Threat Assessment Team visited the Murray Post Office for the purpose of investigating allegations about Clark, stemming from the complaints Daquilla and other Murray Post Office employees had made about him. [*Id.* at 6.]

Months later, in June of 2015, Daquilla alleges that Clark instructed her to return to the Murray Post Office at the end of her shift, but before she had finished delivering the mail assigned to her, at which time she passed off her undelivered mail. [*Id.* at 6-7.] The next

morning, Daquilla alleges that she found that undelivered mail hidden in her mail hamper at the office, an offense Daquilla claims could have gotten her fired. [*Id.* at 7.] She alludes to the idea that Clark was involved in hiding the mail. [*Id.*] Defendant claims that Clark was on vacation at the time these events transpired. Additionally, in September of 2015, Daquilla alleges that she again requested assistance on her route and asked Clark if she could skip lunch in order to meet the route's demands. [*Id.* at 7.] Clark allegedly denied both of these requests, although Daquilla claims that Clark has let at least one male carrier skip lunch. [*Id.*] Daquilla also alleges that, because of Clark's attitude and hostile demeanor, she has become "worried about her personal safety and well being, as well as [that of] her co-workers at the Murray Post Office." [*Id.*] Lastly, Daquilla references incidents between Clark and other females employees in the Murray Post Office, including Clark berating Tara Jerome, who was pregnant at the time, and that Clark had employee Dora Carlson follow Daquilla into the bathroom at work to monitor her. [DN 38-3, at 262.]

Daquilla filed two separate complaints with the Equal Employment Opportunity Commission ("EEOC"), both of which were dismissed. [*See* DN 38-10; 38-13.] The Amended Complaint was filed within 90 days of the receipt of the EEOC's decision regarding Daquilla's second complaint, as required by the terms of that decision.

## II. LEGAL STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When examining whether a motion for summary judgment should be granted, the court is required to resolve all ambiguities and draw all reasonable inferences against the movant. *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "not every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). Rather, the question is whether the party who bears the burden of proof in the case has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). This means that the plaintiff must present to the court more than a mere scintilla of evidence supporting her position. *Id.* Indeed, the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *Id.* It is not enough for a plaintiff to present speculation as to elements of the case, because "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## III. DISCUSSION

### A. Disparate Treatment Claims

In a Title VII action, the burden of persuasion rests with the plaintiff to establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To that end, "[the] plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 858, 864-65 (6th Cir. 2003) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000)). In the case where a plaintiff is able to present to the Court "direct evidence of discriminatory intent in connection with a challenged employment action, 'the burden of both production and persuasion shifts to the employer to prove that it would have [taken the adverse action] even if it had not been motivated by impermissible discrimination.'"

*Id.* at 865 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). Where no direct evidence of discrimination is present in a case, "Title VII claims are subject to the familiar burden-shifting framework set forth in *McDonnell*…as is subsequently modified in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981)." *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 390 (6th Cir. 2009).

Pursuant to the *McDonnell* framework, once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell*, 411 U.S. at 802. Then, if the employer is able to demonstrate a nondiscriminatory reason for the action, the burden shifts back to the plaintiff to show that the employer's reason is actually pretext for some unlawful discrimination. *Id.* at 804. In such a case, the burden of persuasion remains with the plaintiff at all times. *Risch*, 581 F.3d at 391.

### i. Age Discrimination

The Age Discrimination in Employment Act, or ADEA, prohibits the discharge of, or discrimination against, an employee who is 40 years of age or older because of their age. *See* 29 U.S.C. § 623(a); *see also Clevidence v. Wayne Savings Community Bank*, 143 F. Supp. 2d 901, 906 (N.D. Ohio 2001). "An employer violates the ADEA when preference is given to a younger employee even if the younger employee is within the protected class of persons age 40-and-over." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990). Daquilla presents no direct evidence of age discrimination in the present case, which means that her allegations must satisfy the *McDonnell* test, outlined above. *See id. See also Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1180 (6th Cir. 1983).

Under a claim for age discrimination due to disparate treatment, the plaintiff must demonstrate four separate elements: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. College*, 698 F.3d 275, 283 (6th Cir. 2012); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). Defendant does not contest the first two elements: Daquilla was 40 years of age or older at all relevant times, and was qualified for her job. Where Defendant takes exception is with respect to prong three: "adverse employment action." Defendant claims that Daquilla cannot point to any adverse action actually taken against her, whether based upon age or otherwise, and thus, her claim must fail as a matter of law. The Court agrees. Daquilla has presented no evidence tending to show that she was subjected to any adverse employment action, and therefore cannot proceed under this theory.

The phrase "adverse employment action" has been construed to mean a "materially adverse change in the terms and conditions of a plaintiff's employment." *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014). Thus, actions that amount to "mere inconvenience or an alteration of job responsibilities" will not suffice. *Id.* "Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions," but may rise to level of being "materially adverse" if accompanied by "a demotion evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (internal quotation marks omitted). Ultimately, the test is an objective one, which takes the totality of the circumstances and asks whether a reasonable person, from the perspective of the plaintiff, suffered adverse employment action. *Id.* at 918-19 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006)).

Taking the totality of the circumstances in the present case, it is clear that Daquilla was not the victim of any adverse employment action. Indeed, while making a passing reference to this requirement in her Amended Complaint, [DN 27], ("Plaintiff…suffered adverse employment action"), she provides no clear reason or evidence why or how that is the case. Instead, the facts that Daquilla have presented to the Court, coupled with the argument she makes in her Response to Defendant's instant Motion, [DN 45], indicate to the Court that Daquilla is really arguing a hostile-work-environment claim. Indeed, noticeably missing from the interactions Daquilla describes between herself and Clark are actions on the part of Clark, or another USPS employee, which rise to the level of an adverse employment action. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461-62 (6th Cir. 2000) (explaining that "[t]he Sixth Circuit has consistently held that de minimis employment actions are not materially adverse and, thus, not actionable."). Daquilla does not argue that she was fired, suspended without pay, given a demotion or pay decrease, that she lost any job titles or benefits to which she was entitled, or that her job responsibilities were taken away from her. Rather, she alleges unpleasant confrontations with a supervisor, which she claims were motivated by her age and gender. This, without more, cannot rise to the level of "adverse employment action." To the extent that Daquilla has pled an age discrimination claim under the theory of disparate treatment, that claim fails as a matter of law. The facts, as opposed to the allegations in the Amended Complaint, as simply insufficient.

### ii. Gender Discrimination

Daquilla has also raised a claim of gender discrimination in violation of Title VII under the theory of disparate treatment. A claim of gender discrimination, without direct evidence and based upon the theory of disparate treatment, is very similar to a claim of age discrimination: the plaintiff must show: "(1) she is a member of a protected group; (2) she was subjected to an

adverse employment decision; (3) she was qualified for the position; and (4)…similarly situated non-protected employees were treated more favorably." *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). However, because the Court has already established above that Daquilla was not subjected to any "adverse employment action," any claim for gender discrimination under a disparate impact theory necessarily fails as a matter of law, as it cannot meet the second requirement of the test.

## B. Hostile Work Environment

### i. Age

Daquilla has also raised claims of a hostile work environment. Under the theory of an age-based hostile work environment, the plaintiff must show: (1) at all times relevant to this lawsuit she was at least 40 years old; (2) she "was subjected to harassment, either through words or actions, based on age;" (3) "[t]he harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment;" and (4) "[t]here exists…some basis for liability on the part of the employer." *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996); *see also Snyder v. Pierre's French Ice Cream Co.*, 589 F. App'x 767, 773 (6th Cir. 2014).

Again, it is uncontested that, at all times relevant to this lawsuit, Daquilla was at least 40 years of age. Where the parties disagree is whether the incidents between Daquilla and Clark amount to a "hostile work environment." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The Supreme Court instructs that Title VII will be violated in a situation where "the workplace is permeated with discriminatory intimidation, ridicule, and insult…that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment…." *Id.* As this language suggests, and as the Supreme Court has made clear, Title

VII violations exist in a middle ground "between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* This creates a dividing line between conduct which does not "create an objectively hostile or abusive work environment," and conduct which "leads to a nervous breakdown." *Id.* at 21-22. The former is insufficient, while the latter is well beyond the threshold. Further, while the conduct complained of must objectively create a hostile or abusive work environment, so too must the plaintiff *subjectively* feel that the work environment is a hostile or abusive one. *Id.*

Upon close examination of the above standard, the Court finds that, with respect to her age-based claim, Daquilla has failed to show a hostile or abusive work environment. Indeed, in her Response to Defendant's instant Motion, Daquilla does not present to the Court more than a scintilla of evidence tending to show that she was subjected to age harassment of the kind that would lead to this Court characterizing her work environment as a hostile or abusive one. To be sure, in her argument pertaining to the gender-based claim, Daquilla references and otherwise describes interactions with Clark that she alleges constituted severe or pervasive harassment. However, she makes no attempt to connect these incidents with her age or proffer evidence to the same effect. *See Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 471 (6th Cir. 2014) (explaining that a "Plaintiff must show that she was harassed *on the basis of her age* and that such harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.") (internal quotation marks omitted) (emphasis added). This Daquilla has not done. Mere passing references in pleadings and argument to the fact that she belongs to a protected class under the ADEA, coupled with uncomfortable and unpleasant conversations with her supervisor, fall short of establishing a

prima facie case for age discrimination under a hostile work environment theory. Again, the facts are insufficient to support this claim.

As an example, in *Hale v. ABF Freight Sys.*, 503 F. App'x 323 (6th Cir. 2012), the claim failed where the plaintiff received numerous emails containing language such as "you have let me down," and "you were clueless," and "I continue to have the same problems with you over and over." The Sixth Circuit held that the plaintiff's characterization of a "barrage of criticism" did not rise to a level sufficient to implicate Title VII. *Id.* at 338. Even though such criticisms are undoubtedly "frustrating and discouraging, they were part of the ordinary tribulations of the workplace that do not amount to the sort of extreme conduct required to effect a change in the terms and conditions of employment." *Id.* (internal quotation marks omitted). Thus, even though the environment at the Murray Post Office may have been *subjectively* hostile or abusive in Daquilla's opinion, as a matter of law the environment was not objectively abusive or hostile enough to rise to the level of implicating Title VII with respect to her age-based claim. In neither her Amended Complaint nor in her Response to Defendant's instant Motion does Daquilla allege instances of abuse, harassment, or confrontations specifically relating to her age. But more importantly, in her deposition testimony, Daquilla does not establish any specific instances of abuse or discrimination due to her age. She testified that, when Clark accompanied her on her route, he complained that his legs were hurting from walking so slow, [DN 38-3, at 256], but this alone is insufficient. Accordingly, Daquilla's age-based hostile work environment claim fails as a matter of law and is dismissed.

### ii. Gender

Daquilla asserts more strongly a claim of a hostile work environment with respect to her gender. Here, a plaintiff must show that:

(1) she is a member of a protected class (female), (2) she was subjected to harassment, either through words or actions, based on sex, (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offense work environment; and (4) there exists some basis for liability on the part of the employer.

*Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008) (citing *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996)). Moreover, "[t]he harassment must meet both an objective and subjective test," and "must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Id.*

Again, it is uncontested that Daquilla, as a female, is a member of a protected class. However, the crucial question is whether Clark's actions rise to a level sufficient to create, as a matter of law, a hostile work environment with respect to Daquilla's gender. The Supreme Court's guidance on this issue is helpful. It instructs that the Court should examine (a) "the frequency of the discriminatory conduct," (b) the severity of that conduct, (c) whether the conduct at issue "is physically threatening or humiliating, or [is] a mere offensive utterance," and (d) whether the conduct at issue "unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Additionally, the Court must "determine whether the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive…." *Grace*, 521 F.3d at 678-79 (citing *Harris*, 510 U.S. at 21).

The main thrust of Daquilla's argument in favor of her claim is that the cumulative effect of the encounters she and other female Murray Post Office workers had with Clark created a gender-based hostile work environment, thus implicating Title VII and its protections. Many of the incidents appear to stem from Clark's attitude toward Daquilla. She testified in her deposition that Clark made belittling and berating comments to her, [DN 38-3, at 250], and that he made a habit of staring at her while she was working. [*Id.* at 157-58.] Notably, the Sixth Circuit has

explicitly stated that "[s]taring at someone, without more, is not generally sufficient to create a hostile work environment." *Mast v. Imco Recycling of Ohio*, 58 F. App'x 116, 123 (6th Cir. 2003) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999); *see also Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 346-47 (6th Cir. 2008) (finding no hostile work environment where defendant's actions included staring at plaintiff, making occasional disparaging comments, and allegedly treating female workers "in a hostile, harassing way with an air of intimidation and discrimination.").

Notwithstanding that fact, and Defendant's vehement argument that these incidents between Daquilla and Clark, all standing alone, do not rise to a level sufficient to implicate Title VII, the Court cannot simply examine each incident in a vacuum. The test is the totality of the circumstances, and not a series of discrete analyses. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999) ("a district court should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode."). Measuring each episode individually would result in an inequity because it would abrogate the totality of the circumstances test in favor of a disaggregation of the hostile interactions, which would inevitably favor the employer by "rob[bing] the incidents of their cumulative effect." *Id.* (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990)) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."). The Court must therefore look at all of the incidents between Daquilla and Clark, as well as those incidents between other female workers at the Murray Post Office and Clark about which Daquilla had knowledge, and ask whether, taken together, there was a hostile work environment.

In *Quanex*, 191 F.3d at 660, "[e]vidence of racist conduct affecting African-American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence that [the plaintiff] learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was…hostile…." The Sixth Circuit reaffirmed its stance on other-acts evidence of harassment in *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (2008), noting that the court "may consider evidence of other acts of harassment of which a plaintiff becomes aware during the period of his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence." Here, Defendant argues that where most of the comments at issue are not directed specifically at a plaintiff, "it supports the conclusion that the conduct was not severe or pervasive enough to create an objectively hostile work environment." [DN 49, at 10 (citing *Knox v. Neeton Auto Prods. Mfg., Co.*, 375 F.3d 451, 459 (6th Cir. 2004).] The *Knox* Court acknowledged that the comments at issue there "were usually made during shift meetings and were directed to the group, rather than to her personally," and cited to *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997) for the proposition that this fact "contributed to the conclusion that the conduct was not severe enough." However, this Court is dealing not only with comments made to both Daquilla and other female workers at the Murray Post Office, but also with Clark's *conduct* towards Daquilla and those other female workers, none of which was confined to group discussions at shift meetings.

The Court first examines the frequency of the complained-of conduct. *See Harris*, 510 U.S. at 23. Daquilla does not provide the Court with a precise timeline of Clark's allegedly hostile and abusive behavior. The only consistent conduct that Daquilla claims constituted harassment was Clark's alleged habit of staring at her and making belittling comments while she

was working. [*See* DN 45, at 10 (Bonnie McCuiston Depo., testifying that "[i]t was normal to see it happen every day.").] Clark's remaining complained-of actions are sporadic, occurring from the time he assumed the position of Postmaster in October of 2014, and September of 2015, almost a year later. Daquilla has testified that, throughout this time period, Clark spoke to her and to other female employees in a demeaning manner numerous times [DN 38-3, at 250, 276-77], that he had female employees followed into the bathroom to make sure they were not wasting time, [*Id.* at 97-98, 262], that he followed her on her mail route and was rude to her, [*Id.* at 260-61], refused her overtime, [*Id.* at 201-02], and denied her route assistance. [*Id.* at 283-84.] To the Court, the frequency with which problems arose between Daquilla and Clark sound, for the most part, like common employer-employee issues encountered throughout the employment relationship. Whether Clark employed the best or even most appropriate means of confronting Daquilla regarding her work is not for the Court to decide. Rather, the issue is whether he frequently engaged in hostile conduct towards Daquilla motivated at least in part by her gender. Daquilla does show *some* frequency, which is further supported by Clark's alleged abusive conduct with respect other females in the office. Daquilla has testified to Clark's treatment of these other female employees, such as Tara Jerome and Kendall Mitchell, which, taken together with his alleged treatment of Daquilla, establishes a more frequent pattern of alleged behavior that could be considered hostile or abusive.

The next two factors the Court will examine are the severity of the complained-of conduct, and whether the conduct humiliated and/or physically threatened Daquilla. *Harris*, 510 U.S. at 23. Here, the vast majority of the problems are not "severe" under the meaning the Court ascribes to the term. For example, in *Temple v. Pflugner*, 866 F. Supp. 2d 735, 741 (E.D. Ky. 2011), the district court determined that the incidents were severe where they rose above "simple

teasing, offhand comments, and isolated incidents," as the comments at issue were "sexually charged," and made in the presence of other people. This included statements such as asking the plaintiff why she would not have sex with him or, when the defendant found out that she had complained about him, he "threatened to 'pound her [expletive] head in,' and 'kill her,' before damaging her car…." *Id.* The district court found that a jury "could find that at least some of this conduct was 'severe,' 'physically threatening,' and/or 'humiliating.'" *Id.* Conversely, Daquilla does not point to sexually inappropriate conduct on the part of Clark, nor does she provide examples of Clark's conduct that was physically threatening. To be sure, she claims that "[s]he experienced embarrassment…[and] humiliation," [DN 45, at 6], and that "she suffered emotional stress…[and] humiliation, [DN 27, at 8], but for the most part she makes these allegations in only the most general of terms. Daquilla does testify, however, that Carlson admitted to her that she had followed Daquilla into the bathroom to monitor her, purportedly on the instructions of Clark. [DN 38-3, at 262.] This testimony is further bolstered by Bonnie McCuiston, who testified that Carlson had also been following her into the bathroom. [DN 45-8, at 25-26.] Clark, of course, denies that he ever gave any such instructions to Carlson or to anyone else. [DN 38-4, at 241.] Carlson also denies that she ever followed Daquilla, or any other employees, into the bathroom to monitor them. [DN 38-7, at 83.] But this targeted invasion of Daquilla's privacy, if true, would constitute highly inappropriate behavior by a male supervisor directed at a female employee, and would fall squarely within the realm of what this Court would consider to be humiliating and embarrassing.

The final factor is whether the conduct at issue "unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Daquilla alleges that Clark's conduct did, in fact, impair her ability to do her job. As noted above, she testified that Clark stared at her

constantly while she was trying to work. [*See* 38-3, at 119, Daquilla testifying about Clark: "[h]e would stare a hole through my back."] Additionally, while Defendant points mostly to isolated incidents, such as Clark refusing to allow Daquilla to skip her lunch in order to complete her mail route, or the "monkey" comment, the Court is much more concerned with the day-to-day distractions and belittling incidents within the office. In her deposition testimony, Daquilla references numerous unpleasant interactions with Clark, ranging from him berating her in the office, to him watching her from an uncomfortably close position, to Clark refusing to give her directives while doing so with males in the office.

Crucially, though, Daquilla also points to numerous incidents between Clark and other female employees of the Murray Post Office. As noted above, other-acts evidence is certainly relevant in a hostile work environment case like this one, where the plaintiff is aware of the manner in which the person at issue is treating other members of their gender. For instance, Daquilla describes Clark behaving in such a rude manner towards Jerome that it made her cry. [DN 38-3, at 114-15.] She was pregnant at the time, and Daquilla testified that he smiled after she began to cry. [*Id.* at 114, 136.] Daquilla further testified that, when Jerome submitted paperwork to Clark regarding medical leave for her pregnancy, he took her into his office and began asking for specific information concerning her doctor's appointments. [*Id.* at 144.] Daquilla also testified about former Murray Post Office employee Kendall Mitchell, who left the office because of Clark. Daquilla described running into Mitchell after she left, at which time Mitchell expressed her "condolences" that Daquilla was still working for Clark, because she had never met someone like Clark, and that he was "after" Daquilla. [*Id.* at 141.]

Upon close examination of the record, the Court is satisfied that Daquilla has adduced sufficient evidence of a hostile work environment to establish a prima facie case on this claim.

There is deposition testimony that supports an inference that Clark specifically targeted females in the Murray Post Office, including Daquilla, with unfavorable treatment, directly interfering with the workflow in the office and humiliating and embarrassing Daquilla and other females. Daquilla further testified that Clark had her followed into the bathroom to monitor her. Although Clark's and Carlson's deposition testimony dispute this last allegation, McCuiston's testimony supports it, and the Court finds that this is a material fact, which goes to the question of the severity of Clark's behavior. Clark's allegedly inappropriate conduct persisted for approximately a year, and began as soon as Clark assumed his position there in October of 2014.

Where the plaintiff establishes a prima facie case of a hostile work environment, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the [actions taken]." *McDonnell*, 411 U.S. at 802. Here, Defendant points to the unpleasant interactions between Daquilla and Clark and calls them "usual activities between supervisors and employees." [DN 38, at 6.] Defendants rely primarily on the employment relationship between Daquilla and Clark, in the abstract, to support their position that Clark's actions were legitimate and nondiscriminatory. For example, Defendant uses the EEOC's decision dismissing Daquilla's claim for the proposition that "[w]hile management's decisions regarding these issues may be unwelcome to [Daquilla], they cannot in any way be held to amount to the type of unwelcome conduct that is prohibited by the harassment statutes." [*Id.* at 5-6.] The Court finds that this explanation is facially legitimate.

However, "[a] plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler v. White's Fine Furniture*, 317 F.

3d 564, 576 (6th Cir. 2003) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). With respect to the second factor, the Court finds that Daquilla has carried her burden of showing that Clark's actions were not actually motivated by Defendant's proffered reasons, and that a reasonable jury could so find. Specifically, Daquilla has presented evidence which, if taken as true, tends to show that Clark's behavior toward Daquilla was not motivated by discretionary, managerial decisionmaking tactics, but rather, by a desire to discriminate against Daquilla. For while Defendants may have a point concerning Clark's refusal to change Daquilla's route, or certain internal matter concerning employer-employee procedures, the main thrust of Daquilla's argument is the demeaning and belittling manner in which Clark treated her and other females in the office. Lastly, Daquilla and other female employees allegedly being followed into the bathroom, if true, goes to the insufficiency of Defendant's argument of a legitimate, nondiscriminatory reason for what Clark did. Summary judgment is denied on this claim.

### C. Retaliation

Under Title VII, a plaintiff "may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). As explained in *Imwalle*, "[d]irect evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Id.* at 544. Conversely, where only circumstantial evidence is produced, the *McDonnell* framework is used. Under *McDonnell*,

> [t]he plaintiff has the initial burden…to establish a prima facie case of retaliation by showing" four elements: (1) she was engaged in a protected activity; (2) the defendant had knowledge of her exercise of this protected activity; (3) she suffered adverse employment action, or suffered severe or pervasive retaliatory harassment from a supervisor; and (4) there exists a "causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Co. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). If done, the burden "shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for its actions." *Imwalle*, 515 F.3d at 544. If the employer does this successfully, "the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Id.*

However, as the Supreme Court explained in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006), "[t]he antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." To that end, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse…." *Id.* at 68. Material adversity should be differentiated from trivial harms, for Title VII "does not set forth a general civility code for the American workplace." *Id. See also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining that the court should "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."). This is an objective standard. *Burlington*, 548 U.S. at 68.

The Court finds that Daquilla was engaged in a protected activity. "Under Title VII, there are two types of protected activity: participation in a proceeding with the…EEOC and opposition to an apparent Title VII violation." *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 469 (6th Cir. 2012). Here, the record reflects that Daquilla initiated the EEOC administrative process in October of 2014, and filed formal complaints with the EEOC on two separate occasions during the relevant time period, as well as multiple grievances with the USPS. [DN 27, at 3.] Her participation in these proceedings constitutes protected activity under Title VII, and Defendant does not contend otherwise. Second, Defendant does not allege that Clark had no knowledge of

Daquilla's participation in this protected activity. The heart of the issue, then, revolves around elements three and four. Due to the fact that the Court has already established above that Daquilla suffered no adverse employment action, Daquilla must proceed under the theory that she suffered severe or pervasive retaliatory harassment at the hands of Clark under element three, and that there was a causal connection between her participation in the EEOC proceedings or the complaints she had lodged with the USPS and Clark's actions under element four.

"There is of course no mathematically precise test for" what constitutes "severe or pervasive" in the context of a retaliation claim under Title VII. *Jordan v. City of Cleveland*, 464 F.3d 584, 598 (6th Cir. 2006). Instead, it is a totality of the circumstances analysis. *Id.* In Daquilla's Response to the instant Motion, under the third element of retaliation, she merely puts "[t]his element has been discussed supra." [DN 45, at 13.] The Court will construe this as referring primarily to her earlier argument in the Response regarding the hostile work environment claim based upon her gender, as her age discrimination claim has failed as a matter of law. Due to the fact that the Court has decided that Daquilla has established a prima facie case of a hostile work environment based upon her gender, the Court finds here that she has adduced sufficient evidence to meet the requirements of element three of a retaliation claim.

The final element Daquilla must establish is a causal connection between her act of filing EEOC complaints and grievances with the USPS and Clark's alleged harassment. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). Importantly, temporal proximity, without more, is insufficient. *Id.* Rather, where the plaintiff relies on temporal proximity, it must be accompanied by "other indicia of retaliatory conduct" in order to support a finding of a causal connection. *Id.*

Here, Daquilla's Amended Complaint only provides the most general of explanations in support of the causal connection prong: "her employer took materially adverse action against Plaintiff, and…a causal connection exists between the protected activity and the adverse action." [DN 27, at 9.] Next, in Daquilla's Response to the instant Motion, she provides the following argument in support of a causal connection: Clark was "aware that Daquilla had filed an EEO Complaint. Nevertheless, Clark continued to harass Daquilla….Defendant offers no explanation for this action….There is no other explanation for Defendant's conduct towards Daquilla." [DN 45, at 13.] It is true that, "at the prima facie stage, the burden [on the plaintiff] is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from the evidence, providing it is credible." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). As the Sixth Circuit explained in *Nguyen*, 229 F.3d at 563, "[a]lthough no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation."

While Daquilla alleges in numerous places that Clark treated her unfairly, harassed her, and belittled and humiliated her, she only points to two instances after she filed a formal or informal complaint with the EEOC whereupon Clark treated her differently, worse, or otherwise retaliated against her in any way. One of these is with respect to the hidden mail incident. Daquilla testified that she "believe[s]" Clark hid surplus mail in Daquilla's mail hamper that Daquilla failed to deliver during a shift. [DN 38-3, at 213.] Hiding undelivered mail is a terminating offense. However, Defendant counters that, when this incident allegedly occurred, Clark was on vacation and therefore could not have done what Daquilla alleges. Moreover,

Daquilla has not presented any *actual* evidence that Clark did this, or that he was in any way involved in this alleged incident. Her suspicions do not lend any weight to the argument.

The only other instance of alleged retaliation to which Daquilla points is in her Amended Complaint. There, she alleges "that in November on or about the 8th, Post Master Clark denied Plaintiff use of Plaintiff's long life vehicle to punish Plaintiff for having filed a complaint." [DN 27, at 5-6.] This conclusory allegation, without any credible evidence to support it, is insufficient to sustain Daquilla's burden upon Defendant's Motion for Summary Judgment. Indeed, the only instance the Court can find in which the loss of Daquilla's long life vehicle was mentioned again was in her deposition, wherein she was asked: "he [Clark] didn't take away the car altogether?" Daquilla answered, "No." [DN 38-3, at 279.] Rather, Clark apparently instructed Daquilla to do a "park-and-loop," which involves more walking, and was characterized by Daquilla as a "route change." [*See id.*] Daquilla goes on in her testimony to explain that, in her opinion, the route and its timing should have been adjusted to accommodate her height and age, because the timing for it had previously been established by a taller, younger man. Daquilla does not explain which complaint led to Clark retaliating against her, nor does she specify exactly when Clark learned that she had filed complaints against him. Instead, Daquilla merely states in conclusory fashion that Clark "knew." And in Clark's deposition, while he admits that he was aware that grievances had been filed against him, he does not point to a specific date either. [*See* 38-4, at 216.]

"The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 28 (6th Cir. 2013). It appears to the Court that, while Daquilla has alleged a pattern of alleged harassment from Clark, starting before her commencement of EEOC proceedings or her grievances with the USPS and continuing after, she has not adduced any evidence that Clark escalated his behavior

in response to these actions, or that he specifically targeted her in response to her protected activity. The bare allegation in her Amended Complaint that he deprived her of the use of her long life vehicle in retaliation for her protected activity (although Daquilla later contradicted herself in her deposition testimony) is not sufficient. As a result, Daquilla's retaliation claim fails as a matter of law.

Moreover, even if Daquilla could meet her burden of establishing a prima facie case of retaliation, she cannot prove that Defendant's actions were merely pretext. Where the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the [action]." *McDonnell*, 411 U.S. at 802. As noted in the EEOC Opinion, Daquilla was on the employee list indicating she did not want overtime pay, and Clark walked her delivery route with her due to the amount of assistance Daquilla had been requesting. [DN 38-10, at 12.] Further, Clark stated that he changed Daquilla's route for safety and efficiency purposes, and not to retaliate or discriminate against her. Indeed, Clark claimed he did not know of Daquilla's allegations that he was trying to force her out by changing her route until he saw the EEOC complaint later. Defendant has carried its burden of articulating legitimate, nondiscriminatory reasons for the challenged actions.

"A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler*, 317 F. 3d at 576 (quoting *Dews*, 231 F.3d at 1021). In Daquilla's response to the instant Motion, she points to four incidents as pretext: (1) holding Daquilla to the delivery times of a younger, taller male; (2) staring at her while she worked; (3) refusing to allow her to skip lunch; and (4) the "monkey" comment. The "monkey" comment is

irrelevant to the retaliation claim, as is the allegation that he stared at her while she was working. Moreover, Daquilla cannot show that Clark's refusal to allow her to skip lunch was retaliation for any protected activity, for though she claims that males were allowed to do this and she was not, Clark stated that the routes have a built-in lunch period, and eventually *all* employees were allegedly allowed to do this after Daquilla complained. [DN 38, at 4.] Lastly, Daquilla claims that Clark's refusal to change her route was discrimination and/or retaliation, but Defendant argues that this was merely a matter of work ethic, and Clark had determined that Daquilla's route "ha[d] a lot of time-wasting built into it." [*Id.*] Daquilla's bare assertions regarding Clark's motivation cannot be sufficient to overcome Defendant's legitimate, nondiscriminatory rationale for why her route-change request was denied. Therefore, Defendants are entitled to summary judgment on Daquilla's retaliation claim.

## IV. CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [DN 38] is **GRANTED IN PART** as to Daquilla's age and gender disparate treatment claims, her age-based hostile work environment claim, and her retaliation claim, **AND DENIED IN PART** as to her gender-based hostile work environment claim.

**IT IS SO ORDERED.**

cc: Counsel of Record